The matter on the morning docket is 518-0234 in the matter of Travis Van Dorn v. Sarah Van Dorn. Mr. Drazen. Good day to the court, Justices, Mr. Block. My name is Jim Drazen and I represent Travis Van Dorn. The case before you today has to do with what used to be called custody, what's now called parenting time, primarily. There's a couple of other peripheral issues, but primarily it's in custody and parenting time. Prior to getting into the issues of the court order itself, final order itself, I think a couple of background facts or statements kind of lay the foundation for where I'm headed. This case was a case where there was a temporary order for parenting time, and pursuant to the temporary order for parenting time, my client, Travis Van Dorn, who was injured and he was off work, he had no other job responsibilities at that time, he was granted parenting time every Tuesday and Wednesday, every other weekend, and every Monday with his oldest daughter. He effectively had more than seven days with these kids every two weeks. These children were, at the time the case was filed, approximately one and a half years old. Of the olds who were one and a half years old, the twins were just several weeks old at that particular point in time. Within about three months of that filing, Mr. Van Dorn had parenting time with those children more than seven days every two weeks. As we went through the process of this case, a guardian ad litem was appointed by the court to conduct an investigation and a report. Having been a guardian ad litem myself in numerous circumstances, I understand what's required of a guardian ad litem in order to provide the proper investigation for the court. In this case, I believe nothing happened along that line. Let me ask you this first. Yes, Your Honor. I have a couple questions, actually. The first question that we must ask ourselves is where jurisdiction lies in this case. Yes, Your Honor. There was a prior appeal that was dismissed. That's correct. And as I understand, that appeal went to the first two orders that are at issue here. We have three orders at issue that you claim. Your Honor. The first two were the subject of an appeal that got dismissed by this court for want of prosecution. So tell us how it is that we are now going to hear those same two arguments on those same two orders that were previously dismissed. Yes, Your Honor. Good question. The issue is whether or not the court had jurisdiction in the very beginning anyway. The court has jurisdiction, as I stated in my reply brief, when there is a final judgment, and the final judgment disposes of all the rights or the powers. Except when it comes to matters of child support and parenting time, there's really never a final judgment because they're always subject to modification. They're always subject to modification, but they become finalist for purposes of that particular proceeding. Right. And this one wasn't final at that particular point in time. And the reason why it was final. Which one was not final? None of them were final. The order of December 11th, 2017, was not final when the notice of appeal was filed in January of 2018. And the reason for that is because there were several issues still remaining. In fact, the order of December 11th itself reserved the issues of average distribution to workers' compensation award. In addition to that, a stipulated order was entered on that exact same date, which reserved the issues of child support, non-minor support, pre-kindergarten fees, extracurricular fees, daycare and school costs. So you're saying that an order that reserves certain issues cannot be the subject of an appeal? And that's exactly what Blumenthal Court says, Your Honor. Blumenthal Court says jurisdiction is vested in the court of appeals when a final decision is made which disposes of all the rights and obligations of the parties. In this case, clearly they weren't. And, in fact, the court in this particular case set on March 26th all remaining issues for April 10th. Pursuant to the other two cases that I cited, the Tremor case, the Tremor case indicates that a final order is one that disposes of all issues that may be appealed. The Sanchez case is a case where the court said that the federal court doesn't have jurisdiction until there's a final order. So when counsel points to the case that they pointed to with regard to why this judgment was already done, that case says that where an appellate failed to conduct an appeal of an otherwise appealable order. Well, this order itself wasn't an appealable order because it wasn't final. And because it wasn't final, this court didn't have jurisdiction at that point in time. So, therefore, this court can properly and should properly hear all of the issues presented at this time. What about the October 2nd, 2017 order? None of those orders, Your Honor, finalized all of the issues. What was deficient about the October order? Well, they still left in place, Your Honor, all those issues that got set forth in the April 11th order. And that was whether or not there was a mortgage, how the workers' compensation was going to be divided, and those issues relative to child support. And we've appealed that also, pre-kindergarten fees, extracurricular fees, and school bills. All of those issues were still not in play. I don't see any reservations in the October 2nd order. But it didn't include those issues, Your Honor. Those issues were just still pending. And there is no finding in the October order, the October 2nd order, that says there's no just reason to delay the 4th of our appeal. In fact, that order in October set December 11th as the next hearing date. And December 11th was the hearing date in which the court addressed the issues of the stipulated settlement, the issues of any disputes with regard to the parenting plan, and various other disputes. But it did not resolve these other remaining issues. In fact, other remaining issues were addressed in that December 11th order that emanated from the October order. So there was a series of orders that came down, none of which became final until April of 2018. At that point in time, this court probably had jurisdiction to decide these issues. Okay, so you're saying that these various orders, the October 2nd and the December 11th orders, were just interim orders? I call partial orders, Your Honor. Partial orders. Okay. That's what I call them. And the court had another question for me. And certainly not final. Correct. Absolutely not final. Not according to the case law that I cite. And I believe that's the prevailing case law at this time. Okay. And if the court doesn't have another question, I'll move on. With regard to the actual arguments itself, Mr. Seiber was then appointed as the guard at that hour. Mr. Seiber indicated, contrary to what the statute calls for, that he really doesn't do investigations. He also indicated that he really didn't do a lot of his contested divorce work. And basically what he thought he should do is he would allow people to kind of come to him and bring to him what they wanted him to take a look at. And then he'd take a look at them. Well, that's not what the case law, the Supreme Court case law, which is Stutz v. McCarthy, that's not what they say. It's also not what the statute calls for. Well, the statute with regard to marriage and disillusionment of marriage cases, which is 750-ISCS-570-506-A2, says the GAL is appointed to submit a report, testify, add to a recommendation in accordance with the best interest of the child, and he must investigate those facts. He didn't investigate any facts. He said facts should come to him. Well, he spoke to the parents, right? He spoke to the parents, but he indicated in his deposition, which was introduced in evidence and a trial, that I would speak to them if they contacted me. I'm not going to go out and speak to them. No, but you did speak to them. I did end up speaking to them. Did he speak to everybody that he should have spoken to? No. For example, Ms. Van Dorn or Mr. Van Dorn's mother, Jean Van Dorn, testified, and Ms. Van Dorn, the respondent in this case, affirmed that Ms. Van Dorn, Jean Van Dorn, was actively involved in these kids' lives from December of 16 through the time that the parties actually separated. Ms. Van Dorn was in the residence of Mr. Van Dorn when Mr. Van Dorn was able to get Mr. Siders to come out and talk to them. He didn't ask her a question, not a single question. He agrees that she was the person that was involved, but doesn't ask her a question. So how is your client prejudiced by that? Because if he had asked her a question, he would have been able to find out the type of parent that my client was and what my client could actually do. Well, he said that your parent robbed his children. Right, but the basic… So how is your client prejudiced? The basic argument of the respondent, Your Honor, was that my client didn't have the physical ability to care for these kids. Because he had a back surgery, he wasn't working. The question is whether he was working. It seemed to me that the GAL, who was stalked by your client and confronted by your client, felt that your client had a war with his ex-wife that was the issue, not that he couldn't care for the children. Well, actually, there's two things with regard to that. First of all, with regard to the fact that he was stalked by my client, that's not happening. And the reason why that's not accurate is this. The court entered orders that said the GAL's fees got to be paid by this date. And if they're not paid by this date, which could be two or three days, that the case isn't going to go forward to trial. So my client goes to his office trying to get in touch with him immediately so he can make the payments to him. And Mr. Seidler believed that was stalking. Well, is it true or are you saying that the GAL's information was inaccurate when he said that your client blocked him in? The testimony from my client was that he pulled next to him. When he found him, he waited for him in his office. His office was closed. He waited for him. He needed to make these payments because there's a series of orders directed regarding his fees and how quickly they must be paid. But there were two separate orders that said, one said these fees had to be paid within two days. I think it was two days. It might have only been a day. Or the case was going to be continued. The other said information had to come to Mr. Seidler within a very, very short period of time. My client showed up with his daughter holding his hand. He wasn't stalking him. He just went there on his time, on his parenting time. Because I told him and he testified that I told him that. You better get this thing paid and you better get it paid right away. The fact that Mr. Seidler is in and out of his office and the office is completely closed caused my client great concern because he's thinking, if I go now and I say, well, I came there and he wasn't there so I went home. Okay, now I've been paid in time. Now the case is going to get continued on me. I thought he had a couple extra days. It seems like one of the things, you know, he can come pay me on Thursday and this is Tuesday and then he shows up on Tuesday even though the lawyer thought he was coming on Thursday. The court order called for him to pay within a very short period of time. I believe it was a couple of days. And when I got the court order, I contacted my client and said, get there immediately. You've got to pay this bill. It seemed like there was more incentive to get him to pardon his daughter's bill paid than to conduct any investigation. Because, in fact, the guardian ad litem not only did he not review these steps wrote back to him that required a review, he didn't know what they were. More clearly, he kind of viewed things from the standpoint of what I called my brief, pretending you're his doctor. Counsel, the argument you're making here seems to be that the GAL didn't do his job right. It was only the court's order that we reviewed, not the way the GAL conducted his job, isn't it? Correct. Except that the court is basing his decision on his findings of what the GAL found. The court doesn't have to accept the GAL. No, the court has to come up with some rational relationship to the statutory factors in his order. Because that's what was stated in my brief, specifically. I'm trying to remember that case now. I'll think of it. It wasn't GAL. It was, I believe it was White. But I can't, I don't know for certain. Please forgive me. But in my brief, I've stated a case that says there has to be an understanding inside the record that the court considered all factors. Well, the only factor testified to by Mr. Seidman at trial was what I call factor number six. That's the factor about the child's adjustment to home, school, and community. He admits in deposition that the only place the children knew was home was Greenville, Illinois. And that Mom moved herself to Edwardsville, Illinois after attempting to try to move her to Missouri. He didn't know that she couldn't move unilaterally to the state of Missouri. He didn't know that. So he then comes to trial and says, prospectively, and there is no case that says you can do this. The statute clearly doesn't. Prospectively, Edwardsville is a better place for the kids to live than Greenville. Presumably because there's better opportunities for the kids in Edwardsville than Greenville, which I would disagree with. Didn't the trial court's order say that he considered the best interest factors? It said he considered, all it did, there's one line where he says he considered the factors and the testimony regarding that line. The cases that I've cited indicate that there has to be some evidence in the record that more than just a bare statement was considered. Now, if there was a whole litany of information in the record, like one of the cases that I cited, the GAO gave a very lengthy report and talked about a whole bunch of different things. And the adult court came back and said, you can look at this and you can see that the GAO and the court were able to rely upon the fact that the mother was having a lot of free time. And that was the primary factor in lettering a decision in favor of the mother and the mother in primary custody. That was the reason why they were able to do it. And they were able to do that in the case at hand. Let me just ask you a question. Yes, Your Honor. So the way that this appeal is structured, you're really moving back in time as to what we're looking at. And you say that the court mentioned nothing in its orders about these factors, where in none of the orders the court says specifically the court considers father's move to District 7 a substantial change in circumstances for father's parenting time. So if we look back into these orders as opposed to these little one-liners that you also want us to review, it seems that the court does put in some factors that it considers. Do you disagree? That's a great question, Your Honor. Well, thank you. That's a great question because in one order the judge did add to the parenting order that if he moves to Edwardsville School District, that would amount to a substantial change in circumstances and allow the court to review it. An order came out two weeks later where that line was completely disregarded from the parenting plan. But your argument was that the court never considered any factors. It just said this bare statement. There are 13 separate factors. I'm sure the court knows all of them verbatim. There are 13 separate factors that the court, and in this case the guardian of my life, must consider in making a recommendation. There's no reference to any of those factors in the court proceeding or in the GAL's deposition except the prospective factor. The fact that Mama moved to herself and the children, you know how to move from Greenville to Edwardsville, didn't create an additional factor in her favor. If anything, as Mr. Cybert said in his deposition, it should have created a factor to her detriment because she pulled the kids out of the only place that they'd ever known, the only home that they'd ever known, which was Greenville, Ohio. Okay. Thank you. Thank you for answering my question. And, Mr. Blood, you'll be allowed some extra time if you need it in light of my question. Thank you, Your Honor. May it please the Court. For the audio record, my name is Curtis Blood, and I represent Sarah Van Dorn, now Whittington. And, of course, we ask that the judgment on appeal be affirmed, the judgment upon county. On the subject of race judicata in the jurisdiction of this Court, it may be true that issues were reserved in the December 11th order, but I don't see that anything was reserved on the October 2nd order that would have affected this Court's jurisdiction. And as I understand it, the question that we're now being confronted with is, was the October 2nd order, the parenting plan, appealable at the time of the first notice of appeal? And as I was reading my Supreme Court rules, that was immediately appealable as a custody matter. What about the fact that it did not say there's no just reason to delay? Do you think that's required in a custody order? I don't. I don't. That is a specific language for a specific kind of interlocutory appeal. And, no, it's a different exception entirely, Your Honor. So if you're right that the October order is not appealable, then what do we do? Because a lot of the argument now goes back to that order. It was appealable. Yes, it was appealable. So if we agree with you, what are we left with here? Well, we've already been through all that. I mean, I entered my appearance. I charged my client. I watched the first appeal and ready to jump in and do my brief and never got there. And, obviously, the annulment. So you're saying there's nothing to discuss about the October order. It's over. That's right. It's done. That's right. Professor Kleder taught us that, I think, in the first order of civil procedures, you don't let a case go to a judgment, an involuntary judgment, unless you want this judicata. And it happened. And what school was that? University of Illinois, Champaign. Okay. Okay. Well, so then do you agree that the order of December is appealable? 2011. Sorry. December 11, 2017. I don't have a problem with that. Okay. The funny thing is there's no issues raised with regard to it. All right. But it is indicated that it's a partial settlement order, right? Yes. So it wouldn't be deemed final. Two appeals or two orders appealed in the first notice of appeal. One appealable, the other I'm not so sure. But I can't say I really let my total burden of concentration on account of there's no issues on here. Okay. It's irrelevant to what we're doing today, Halloween 2019. So ultimately we're looking at the April 10, 2018 order. I believe that we are, Your Honor. Okay. Just aside from the raised judicata issue, even if this Court doesn't agree that the first judgment of this Court was raised judicata, as to the October judgment, we also have this daunting standard of review in this case. And so many strange things happen. I mean, just the stalking incident alone in Greenville, in Greenville. If this had happened somewhere else, it would have quite the effect that it does, considering that the Tom Meyer plaque is at the courtroom in Greenville. And I can't believe that a person who lived in the community wouldn't know about the Tom Meyer incident. And I don't think the judge believed it either. And, I mean, just that, just that, standing alone. And the deference that is owed to trial court in a parenting dispute, it's just daunting. It's just daunting. I mean, right there, do I need to say more? Do I really need to say more? Yes, you do. And I'll tell you, you know, appellate courts are not familiar with Greenville and plaques and things of that nature. But I am concerned about the law that says a court must consider the factors that constitute its decision on best interests. And the case law says that it need not necessarily delineate all the factors, but there must be some indication that it reviewed the factors and considered them. So what do you say about that? Where is that in the record? I believe I cited at least one case that says it's enough if the GAL elaborates on the factors and the judge says he considered what the GAL said. Well, that's why we've heard so much argument, I think, about the GAL and his alleged unfamiliarity with the statutory factors. And the case that you cite, do you remember that case where the court can rely on the GAL, the name of that case? No. I could cite it in the rebuttal. I mean, today I don't have one, but it's in my brief. I know that. Okay. I mean, I could find it. All right. Well, you go in with your argument. I'm still interested in what if you're relying on the fact that the court can rely on the GAL, what do you have to say about the argument that the GAL was unfamiliar with the factors? Well, if you read carefully Appellant's argument on that, he says correctly that the GAL admitted that he didn't read the factors before his deposition. And he turned around and said at the hearing from the circuit judge that he had read the factors, and then he went through them. And that's at Supplement 2, Record, page 445. Attorney Seidler, the GAL, said the most important factors to him under Section 602.7, which he had reviewed for the hearing, were number 12, willingness and ability of each parent to place the needs of the child ahead of his or her own needs. Number 13, willingness and ability to facilitate and encourage a close and continuing relationship between the other parent and child. Number 17, any other factor the court finds relevant. Number 7, the mental and physical health of all individuals. And in the opinion of the GAL, all of those factors favored the mother. Again, page 445 of that transcript. So maybe he didn't consider him for his deposition. Again, I'll say it, a darn good GAL. You know, his procedure wasn't to lay out a road map for the parties. He said he let the parties come to him. He issued them an invitation, a written invitation, and then he waited to see what happened. And the way that they acted on that was part of his research. And I guess if a party didn't come to him, he'd never, I don't know what would have happened then, but that didn't happen. They came to him. They came to him, and he experienced not only what they said, but how they arranged it. What about the fact that the witnesses, people that were integral to the family arrangement, were not all interviewed, such as Mr. Van Doren's mother? Don't you think she would have been an important person to interview regarding his ability to care for the children? Because I remember the testimony. The GAL came to the father's house. Yes. And the father's mother and father came to the house. They were there. And she just breezed through. She just ran through. But surely the GAL could have said, Mr. Van Doren, I see your mother's here. Can I speak with her? I think he could have. But he didn't. No, he didn't. Absolutely did not. Do you think that's important? I think if the trial judge said it was important, I wouldn't have a comeback to that. The judge isn't the one who's supposed to decide which testimony is relevant or not. The judge doesn't get to decide that. The judge listens to what's put on, and if that's not put on, then it's not put on. Whose burden is it to put that on? I mean, do you think the GAL has a duty to investigate? Well, I think that he does. I think he does. And I guess almost any investigation is sure. I mean, I know I wish I had read more before I came up here today. But, I mean, every day I come out here and I'm picking myself for something I didn't do. And I'm sure he probably did too. Did the mother testify? Mr. Van Dorn's mother, did she testify? You know I don't remember. You got me. I do not recall. I'll check on that. I think she might have. I think there's a, I think one of the women that testified, I think it was her. But I, please don't hold me to it.  Specific findings not required, but there must be some indication the trial court considered the statutory factors. That's this court, Stribling, 2009. Specific findings not required if evidence was presented from which the court could consider the factors in Ray A.S., 5th District, 2009. Here the trial court stated it considered the statutory factors, C228. And there was certainly a lot of testimony. This was an awful lot of testimony. This was a big record. How many days of testimony was it? I don't know that, Your Honor. This is an awfully long record. I mean, I'm citing to the transcript from page 435. This is an awfully long transcript. But how many days, I don't know. We haven't talked about the comps that were mentioned. Does the court have any interest in that? How many days did the trial court reach the 1050 figure on child support? It was 1050, right? On basically per month, right? Yes. I mean, 1050 per month. And that's what I was trying to figure out. Your Honor, I admit I glossed right over that. I wasn't appealed. I didn't even give it a glance. Okay. Well, tell us what you believe the subject is on workers' comp, or what's on appeal. The problem was that my trial counsel didn't believe that the father didn't get any money out of the comp settlement. He just didn't believe it. And apparently the judge agreed. Okay, so what evidence was produced that allowed the court to issue the orders that it did? Trial counsel for the father admitted that he had a $174,000 net investment on his settlement. His settlement was $320,000, and I think after attorney's fees it was about $250,000, just over $250,000. And after he'd done all the things people do when they come into a big sum of money, he invested over $170,000. He invested $174,000. In addition, he was getting $150,000 a week. But he testified that that $150,000 a week that he was getting in with one hand, he was paying out with the other hand to his disability insurer. It was the same amount, identical to the penny amount. And his theory of the whole was that he didn't actually have any income as a result of that arrangement. Is there any evidence in the record as to paperwork to support his theory that that was no value to him? That's the problem, yes. He said that he didn't make any money, and he appointed to two pieces of paper. And one of them was a page from his comp settlement, and the other a provision from the disability insurance that said that he had to pay back over payments. And it would seem like, I mean, it was more than 60 days after he settled the case, that there would be something to show that he was actually reimbursing the insurance company, but he didn't have any of that. And that's what my trial counsel says. Don't you have something? There's nothing to actually show that he's paying the money back. Why would he pay the money back? I didn't understand that. Why would he? Yeah. We didn't get it. We didn't get it, and we don't get it now. The judge didn't get it. It's $150 in, $150 out. Okay, okay. So assuming that's true, what about the $174,000? What about that? It just seemed like two different subjects, and we still don't get it. We still don't get it. So I saw a reference in the record, as did Justice Overstreet, that there was an award of $1,050 a month in child support. Child support, right. Where did that number come from? I have no clue. It was never, I mean, in this court it wasn't contested. But it was before the settlement. It was independent of the settlement. The settlement being a lump sum. So the only issue regarding the child support that you know of that's on appeal is the amount of $60,214. Right. They claim it should have been $12,220. Right, which as I understand it is a function of the $174,000. Do you need more time, sir? I do. Thank you, Your Honor. Okay, thank you, Mr. Gladden. Okay. Thank you, Your Honor. Do you have some response? I'm going to try to fly as quickly as I can. First with regard to the order of October 2nd. The court notes in A57, the docket order from Judge Schlemmer at that point in time says, and this is with regard to a parenting plan only. In a judgment of dissolution of marriage, there's a judgment. There's a settlement document. If there's a settlement or there's a judgment where the court enters, divides all those things. And then there's a parenting plan. Those are all independent of each other. In October 2nd, the order had to do with a parenting plan only. So the court says that furthermore, an order is entered concerning the GAL fees. The attorneys will consult concerning all remaining issues and see what issues they can resolve and what will need to be tried. That was on October 2nd. On December 11th, the court notes in its docket order that the workers' comp decision is still reserved. So those issues were still reserved. Now, with regard to the stocking, I want to get to that one more time. My point was the stocking. I want to clear this $1,050 issue. What was my next point? Is that? Okay. Well, we'll reverse them. Okay. Is that an issue on appeal? The adoptive child support is not an issue on appeal. Now, it will be, Your Honor, if the court reverses the lower court's ruling with regard to parenting time because that will change the formula. The $1,050 was part of the formula. Based on what, though? It's the statutory formula that goes into effect for child support based upon how many days you've got the child. No, no. But it also has to be based on income. Based on his income. Yes, it's based on his income and her income. All of those incomes go in. It comes up with a number. According to the formula, there's a number.  And that's where that number comes from. Now, it's important to note that, as I said before, Mr. Van Doren's time with the children was more than seven days a week originally, and the court ordered no support. It cuts the time down to about three days every two weeks. That's seven days every two weeks. And it cuts it down to three days every two weeks and orders support. The problem with the Workers' Compensation Award is the only evidence that's introduced at the Workers' Compensation Award is the award notice, which says you're getting $150 a week for your natural life. And that comes up to $250,000. On that $250,000, the attorneys take X number of dollars. After that, he owes $9,000 to Ms. Van Doren pursuant to an agreement that he made with her relative to the Workers' Compensation Award itself. Then there's a number that's left. And the question is, what happens to the number that's left? Addis Healthcare, his disability payor, says every dime you get over and above what we pay you, you have to pay back. And it refers to such things as Workers' Compensation Awards. So he owes it anyway. So this is a third-party insurance company. Correct. It's called Addis Healthcare. So he had a policy of some kind where they're collecting reimbursement because he got an award for it. There are titles, that's for sure. And all of that's in the record. It's all in the record. It's all part of the evidence. It's in the record. So I disagree with you that if we would reverse on parenting time, that we would also have to consider child support. If, for example, we reverse on parenting time and something changed, then it seems to me your client would then be in a position to potentially file a new pleading regarding child support. It's not something we would do. In theory, he could, Your Honor. However, the problem is this. The way the statute's drafted now, it's all drafted by how many overnights you have per week. Right. Or how many overnights you've got per year. And if you get over 146 overnights per year, you go into a different classification. And that's my point. We don't know as we sit here today, and you have not raised, I don't see it raised. No, it's not, Your Honor. You've not raised the monthly child support. So if we agree with you on the best interests and reverse the parenting time and remand, then the court's only going to deal with that issue. We can't deal with the $10.50 a month. Then depending on what your client gets or doesn't get on remand, you would then have to address that. I think that's true. My view, and I see where the court's position is, my view was, and I believe that's the way the legislative history says, is that parenting time and that support issue kind of go hand in hand. They don't, they're not. Well, they always have, so that's why I'm thinking, you know. But they've changed them from that percentage guidelines that we used to have to this magical formula. Right. And the magical formula isn't geared to who's got primary custody and who doesn't. It's geared to how many overnights you have. But the court still has to have a pleading in front of it. It's not something, you've not raised the $10.50. No. We saw it in the record, but I didn't see it on appeal. No, that's not what I mean. What I see on appeal is this. The $60,000. Right, $60,000. And if I could just address that real quick, Dr. Farrell, there are other numbers that justify that. And as I told the court when they were arguing that, I said, Judge, she's asking for $322 a month, which is roughly 50% of that. Let's assume for a second he doesn't have three-day hours, which he does, you're still giving her 50% of this month. And you're giving it to her now. $60,000 is not 50% of that. No. Here's $150 a week. It computes out to about $650 a month at $150 a week. She asked for $322 a month for the lifetime of the kid. So he was getting an extra $150 a week or $650 a month. Out of that, she wanted the equivalent of $322 a month. So she wanted half of what that increase was if, in fact, it was an increase, which it wasn't even an increase, but she wanted 50%. I said, Judge, where is the justification to grant her 50% of this increase, which we know is set forth at $150 a week? It's in the document that we provided to the court. And there's no dispute on it. The 50% that you're talking about, was that limited solely to a child support discussion as opposed to a marital division of property? Yes, because the woman's compensation award was resolved with it regarding everything except for whether or not it would be used for child support purposes. So it was limited to just child support. Yeah, I did see that. But I cannot, you know, and the judge didn't have a given answer as to why it was that way. And the respondent didn't give any calculations as to how she arrived at $322 a month. It wouldn't work out that way under any formula at all. Under anything. It couldn't work out that way. So you can't have that number. That number doesn't make sense. But more importantly, or as importantly, I would say, is $150 a week. But he's testified, I owe it back to Addis. It's a quid pro quo, if you will. I get it here. I have to pay it here. When I have to pay it, I don't know. Addis is going to tell me that. But I'm still obligated for it. So if they come back and get it, I've got no increase in income. And you've given $60,000 of the amount of money that I've lost to them. Can't the lump sum award be considered as an increase in income overall since it's? As child support, I don't believe it can, Your Honor, because it's listed as child support. So I don't believe it can be listed as an increase in income. So I think she's, that decision kind of pitches the whole thing into a box that he can't possibly get out of. I can't use that to stay away from Addis. So Addis doesn't say, okay, your income has been decreased by $60,000. It says anything I do extra, all of those, including the workers' compensation, I pay dollar for dollar. Back to Addis. Addis says these are the numbers. Was that contract introduced into evidence? It was. The stipulations and the ramifications and the restrictions were all introduced into evidence. Was there, as I recall, there was an agreement, though, that this money be considered as child support as opposed to marital division. As part of the partial settlement because the workers' compensation case technically came up during the course of the marriage. There was an agreement that we would take it out of that area and only let it be considered for the purpose of child support. That's the only way you could consider that at that point in time. She could not ask for a percentage of it for herself, for what she did pursuant to that money. Because he was injured before the marriage. Is this settlement for his injury that occurred before the marriage? He was injured right after the marriage. Right after the marriage. And was operating on six months before the filing of the divorce case. So it was technically, theoretically, marital property. Right. So we took the marital property aspect out of it and left just only the child support aspect into it. But there isn't an increase in income. And if there's not an increase in income, what was the basis to increase his child support? How can you not have an increase in income if you intentionally moved it from being marital property to child support? I mean, essentially, she gave up her 50% interest in a marital property award. Well, an increase in income for child support purposes, I'm talking about, he didn't have an increase in income over what the quote originally were. Because the 150 that was coming in every week is going out every week. And I said the only thing that they could possibly do. But you have an agreement by parties to take this long sum of money and consider it as child support. The only thing it could be considered for was for the purposes of child support. By three million parties. It wasn't going to be child support. But it could be considered for that purpose. And we argued that. And I argued you can't do it as child support because it adds health care to getting all their money back. And if you did argue it, then you've got to go by the real numbers, which is where the $12,000 figure came up that I cited in my brief. If you took that, plugged it into the statute as the court did originally, and considered it all income, the only amount that it could be increased by is $12,000 through the child's life. Well, what they did was they took it through Mr. Van Boren's natural life. So then they're collecting child support theoretically on a time when these kids are long past 19 years of age. So it's an invalid calculation, not supported by any documentation. And we pointed that out to the court, and the court just went with that number because that's the number that the respondent asked for. I have one more question. Yes, Your Honor. This money, the $253,000, is it actual cash or is it invested into an annuity? Well, I don't know the end answer, Your Honor. It's actual cash when it comes through from the… No, but is the $250,000 sitting somewhere? No, the $250,000 comes in. The attorneys took out their version. Well, actually, it was after the attorneys took their version. Okay, it was $320,000. Was it $322,000? Right. The $253,000 is the remaining sum. $253,000 was the remaining sum. $9,000 immediately went to Ms. Vandoren pursuing the partial settlement. Say it again. $9,000 had to be paid to Ms. Vandoren pursuing the partial settlement out of the workers' comp. Then they had to pay back medical payments out of the workers' comp when it came in also, and then the rest got invested, and I believe that's where the number 174 comes from. Okay, and when you say invested, that 174 then is what's producing the 150.64. No, Your Honor. The 150.64 is a calculation that the workers' comp bean counters did to calculate his income, that what they're going to pay him per week for the rest of his natural life. If you look at the workers' comp award… Yes. No, that's how it adds up to the 170. They took that number from the day he was injured, calculated it out to the end of his life, and said this number, $150 a week for all these years, comes up to $322,000, and that's what they're going to give you. And then from that, you pay your insurance fees, you pay your other things, and then the 174 is what's left after all those things got paid out. Where is the 174? That, I believe, the testimony was that was invested, Your Honor. And what does that produce? It produces interest, I'm sure. Okay, some kind of income? I would assume so. I don't know exactly how it produces it, but I argued that exact same thing in the trial court. I said the only thing they could be arguing about that could be used for taxable purposes would be the interest that I get on the money that I've got. You can't take it out of the money that is just a transfer. Why can't it be on the 170-something? Because that money, Your Honor, eventually, at a rate of $150 a week, is owed back to Addis. Well, I don't understand if you've got $170,000 sitting somewhere invested, and it's earning interest.  Correct. The interest isn't. That's the only thing that I argued in the court. So where's the $150 coming from? That's what I'm trying to figure out. How is he receiving $150? He receives a flat fee from Addis every month, which is like $4,000 a month for his income. And it's from that that Addis then wants NEX to pay back to us, because they're paying him his regular income. So in addition to his regular income, he has this $174,000. Which Addis has a claim on, yes. Exactly. Thank you very much. Thank you. I apologize. Thank you. Okay, this court will be in recess. That completes the morning docket.